985 F.2d 559
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Michel Nehme BADAWI, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-3243.
 United States Court of Appeals, Sixth Circuit.
 Jan. 13, 1993.
 
 Before MERRITT, Chief Circuit Judge, and ALAN E. NORRIS and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner, Michel Nehme Badawi, petitions this court for review of the decision of the Board of Immigration Appeals dismissing his appeal from the decision of the immigration judge ordering his deportation.
 
 
 2
 Having had the benefit of oral argument, and having carefully considered the record on appeal and the briefs of the parties, we are unable to say that the Board erred in ordering petitioner's deportation.
 
 
 3
 As the issuance of a written opinion by this court would be duplicative and serve no useful purpose, in view of the Board having articulated the reasons why petitioner should be deported, the decision of the Board of Immigration Appeals is affirmed upon the reasoning set out in its decision dated January 22, 1992.
 
 
 4
 MERRITT, Chief Judge, dissenting.
 
 
 5
 The Immigration and Naturalization Service, acting for the Attorney General, seems to want to rid this country of anyone associated in any way with drugs, regardless of the circumstances. Although Congress has authorized the deportation of dangerous aliens convicted of drug-related offenses, it also has provided for mitigation of the harshness of deportation. While Congress has vested considerable discretion in the Attorney General and his delegate, the Board of Immigration Appeals, the Board's discretion is not unfettered in applying these remedies. Because the majority refuses to curb the Board's abuse of its discretion in this case, I dissent.
 
 I.
 
 6
 The majority merely affirms, with scarcely a passing comment, the decision of the Board of Immigration Appeals below; it is therefore necessary to set out here the pertinent facts of the case.
 
 
 7
 Michael Nehme Badawi is a citizen of Lebanon. He was a police officer in Beirut for several years after graduating from high school. When the village where he lived with his wife was torn apart by warring religious and political factions (the Badawis are Christians), they fled, and legally immigrated to the United States in 1977. With his wife Chams and son Jean Claude (now 15 years old), Badawi has remained in the United States as a Lawful Permanent Resident since that time. His wife was naturalized, and two more children, daughter Simone Michele (now age 13) and son Michael Edward (now age 7), have since been born to the couple and are full U.S. citizens. In addition, Badawi has two sisters, a brother, and nieces and nephews who are U.S. citizens, and his mother also resides here as a Lawful Permanent Resident. In 1983, Badawi's older brother was assassinated when he returned to Lebanon.
 
 
 8
 After his arrival in the United States, Badawi worked as a laborer at a cement block company. About three years later, he struck out on his own as a carpenter. Just over a year after that, he was involved in an automobile accident that necessitated two back surgeries and partially disabled him. But in November of 1984, his real troubles began. A man identifying himself as Masad started calling him from Lebanon, first at his mother's house and then at his own home. Badawi initially did not understand what Masad wanted, but later found out that Masad wanted him to come to New York, where he would receive heroin smuggled into the United States inside Masad's artificial leg. Ms. Badawi testified that Badawi resisted at first, but the family was having financial difficulties. She was seven months pregnant with Michael, their third child, and Badawi felt he "couldn't do enough for his family." Masad eventually offered Badawi $60,000 cash. After some thirty phone calls over three weeks, Badawi finally agreed to meet Masad in New York. Badawi also had a cousin in New York who owned a restaurant, and Badawi testified that his main purpose in making the trip was to help out and earn some extra money for Christmas.
 
 
 9
 Masad was arrested at Kennedy Airport with the drugs. Because of his involvement, Badawi was indicted and ultimately convicted in a jury trial of conspiracy to import and distribute heroin, and possession of heroin with intent to distribute. He was sentenced to two years' imprisonment and a special parole term of five years. While Badawi served out his sentence, his wife worked two jobs to support the family. They spoke on the phone daily, and Badawi sometimes cried because of what he was putting his family through.
 
 
 10
 Badawi's sentence was shortened by several months for good behavior (he was a model prisoner and also worked in the prison hospital). Within a month of his return to his family back in Michigan, he found employment at a Big Boy restaurant, and performed so well that he was rapidly promoted to the level of shift manager. Ms. Badawi continued working as well to help save for their elder son's impending college education. At no time did the family require public assistance payments of any kind. Less than a year later, however, Badawi was struck on the way home from the restaurant late one evening by a drunk driver who ran a red light, and once again he was disabled, this time to the extent of being unable to feed and care for himself. Although he eventually regained his ability to walk, he has been physically unable to return to work at the restaurant. The president of Big Boy wrote a letter November 13, 1989, indicating that they were extremely pleased with Badawi's job performance and will seriously consider rehiring him as soon as he is able.
 
 
 11
 Meanwhile, the Immigration and Naturalization Service in June of 1988 issued Badawi an order to show cause why he should not be deported. Title 8 U.S.C. § 1251(a)(11) provides, inter alia, for the deportation of any alien convicted of a violation of any law governing the importation of heroin. Badawi conceded deportability, but requested three forms of relief: asylum under 8 U.S.C. § 1158; withholding of deportation under 8 U.S.C. § 1253(h); and a waiver of deportation pursuant to 8 U.S.C. § 1182(c). After a hearing, an immigration judge concluded that Badawi was statutorily barred from withholding of deportation because of his drug conviction; that he was not eligible for asylum, and would not merit favorable discretion because of the conviction even if he were eligible; and that he did not deserve waiver of deportation because he was not sufficiently rehabilitated.
 
 
 12
 The Board affirmed the immigration judge on the issues of asylum and withholding of deportation. In considering de novo the issue of waiver of deportation, the Board concluded that the immigration judge had erred in not finding "unusual and outstanding equities" in Badawi's case, but nevertheless affirmed the decision on the basis of lack of rehabilitation. This appeal followed.
 
 II.
 
 13
 Badawi petitioned for asylum under 8 U.S.C. § 1158(a) and withholding of deportation under 8 U.S.C. § 1253(h). Section 1253(h) actually bars the deportation of an alien who will be persecuted if returned to his native country:
 
 
 14
 (1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 15
 (emphasis supplied). The section further provides that the above-quoted paragraph "shall not apply to any alien if the Attorney General determines that ... (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;" id. (emphasis supplied).
 
 
 16
 The Board found two barriers to Badawi's petition for withholding of deportation under this section. First, they assert that by virtue of his having been convicted of a drug-related offense, Badawi automatically falls under the exception of subsection (B) quoted above and is thus statutorily ineligible for withholding of deportation. We must assume, of course, that the immigration judge was in a better position than either the Board or this panel to determine whether Badawi indeed poses a threat to the community of the United States, since he had the advantage of observing and questioning Badawi in person. However, the immigration judge nowhere made such a determination, finding merely that Badawi's convictions established particularly serious crimes, and "[t]herefore, respondent's request for withholding of deportation must be denied." Immigration Judge's Opinion at 7. The Board affirmed on the same basis.
 
 
 17
 This interpretation contradicts the plain language of the provision. By not considering at all whether an alien constitutes a danger to the community, and instead merely applying the statute mechanically based entirely on the alien's criminal record, the Board is rendering the "danger to the community" clause mere surplusage and ignoring the statute's clear command that the Attorney General make a determination. Under established rules of statutory construction, we must reject an interpretation that renders a portion of Congress' voice a nullity. The Board has ignored this rule, reading the statute in such a way that the result would always be exactly the same with or without the "danger to the community" clause. I cannot agree.[1]
 
 
 18
 The second barrier the Board casts before Badawi's plea for withholding of deportation is the finding that he fails to establish a "clear probability" of persecution upon his return to Lebanon, as required by the Supreme Court in INS v. Stevic, 467 U.S. 407, 424 (1984). Badawi testified that his brother was assassinated when he returned to Lebanon from this country in 1983. He also testified that, as Christians, he and his family would be in grave danger in a country no one may seriously deny is convulsed by religious and political strife. The finding of the immigration judge (and of the Board in its de novo review) that, despite this testimony, there is no "clear probability" that Badawi would be persecuted, may be close enough to escape reversal as clear error, and Badawi may not be entitled to the mandatory withholding of deportation provided by § 1253(h).
 
 
 19
 However, Badawi's separate asylum petition requires no such degree of certainty. Asylum may be granted under § 1158(a) "if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title ." A "refugee" under § 1101(a)(42)(A) is anyone unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion ..." (emphasis supplied).
 
 
 20
 A showing of "well-founded fear of persecution" does not require the same burden of proof as a claim for withholding of deportation, INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987); its focus is on the alien's subjective belief. The immigration judge decided Badawi's claim was "based on general conditions prevailing due to current civil strife in Lebanon. He has not shown that a reasonable person in his circumstances would fear persecution for one of the five grounds specified in the Act." Immigration Judge's Opinion at 6-7. This finding is not supported by the record. Badawi testified that he and his family are members of the Catholic church and regularly attend weekly Mass. Tr.Hrg. at 40-41. Badawi testified that if he and his family "go back to Lebanon, Your Honor, going to get killed." Tr.Hrg. at 44. The immigration judge stated on the record early in the hearing that he was familiar with conditions in Lebanon, so that further testimony was not needed. Tr.Hrg. at 6. The immigration judge's dismissal of this extremely prevalent basis for persecution, unquestionably applicable in Badawi's case, is inexplicable.
 
 
 21
 Even more baffling, however, is the finding that Badawi has not been rehabilitated. In Matter of Marin, 16 I & N Dec. 581, 585 (1978), the Board held that an alien convicted of a drug offense must show "unusual or outstanding equities" to merit waiver of deportation under 8 U.S.C. § 1182(c), and that he must generally demonstrate rehabilitation as well.
 
 
 22
 Badawi has two citizen children and a citizen wife, three citizen brothers, and a sister and mother who are Lawful Permanent Residents, all in the United States. Only one brother, whose whereabouts are unknown to Badawi, remains in Lebanon. Badawi has been injured in two separate car accidents, neither of which was his fault, and both of which left him disabled. He has been consistently employed when able, and has excellent prospects for future work at a Big Boy restaurant resulting from his exemplary post-incarceration employment record there. In spite of these remarkable circumstances, the immigration judge found no unusual or outstanding equities in Badawi's case. The Board was compelled to reverse the immigration judge on this issue.
 
 
 23
 Remarkably, however, the Board let stand the immigration judge's determination that Badawi was unrepentant. The Board denounced Badawi's hearing testimony as "evasive," without citing a single question he did not answer directly. For instance, they state that "respondent did not reveal any details regarding the money that he would receive for his involvement," Board Opinion at 9, while neglecting to mention that he was never asked about it. They determined on the basis of a single statement that he did not acknowledge his guilt: when asked whether he planned the heroin importation scheme, he said, "No, I never think [sic] about that. I never ... I don't do that." Id. Yet the record is replete with Badawi's admissions of his guilt. Immediately after he denied planning the scheme, he admitted his blameworthy involvement:
 
 
 24
 A: That is the only ... the first one and the last one.
 
 
 25
 Q: All right. And Mr. Badawi, you were convicted of two counts? Correct?
 
 
 26
 A: Yes.
 
 
 27
 Tr.Hrg. at 33. Soon afterward, he reiterated that his life of crime is over:
 
 
 28
 Q: Do you believe there may be a time when you may get involved in any criminal activity again?
 
 
 29
 A: Not any more.
 
 
 30
 Q: Are you assuring the Court that this was a ...
 
 
 31
 A: Sure I am. That's the last time.
 
 
 32
 Id. at 37.
 
 
 33
 Moreover, many other people associated with Badawi are convinced of his rehabilitation. The Board cited Ms. Badawi's testimony concerning the amount of money Masad offered for Badawi's participation, but nowhere mentioned her testimony that Badawi was depressed and ashamed about his crime: "I don't think my husband would ever do it again.... it was a big lesson for all of us." Tr.Hrg. at 88. The Board completely ignored the written testimony of Badawi's boss at the Big Boy, who wrote that he was of "good character," and the written statement by his parole officer:
 
 
 34
 [I]t was my professional opinion that Mr. Badawi was extremely sincere, when he talked about the stupidity of his actions and the disgrace that he brought upon himself, and his family. He further had indicated that he wants to make amends to his family and to the community for his actions. It has been my experience, that an individual who can feel guilt and remorse for a transgression is highly unlikely, in the future, to again involve himself or herself in any legal difficulty.
 
 
 35
 Letter of Peter Farougi, U.S. Probation Officer, Western District of Michigan, 11/20/89. The Board's finding of lack of rehabilitation is against the manifest weight of the evidence and should be reversed.
 
 III.
 
 36
 The immigration provisions of the United States Code providing for the deportation of drug offenders are there for a reason. Congress clearly does not intend to make the United States a safe haven for aliens who insist on violating our drug laws. However, the provisions requiring judicial review and permitting the harsh penalty of deportation to be set aside under certain circumstances are there for a reason, as well: Congress recognized that there are some situations in which an alien should be allowed to make a fresh start. If Badawi's record does not present a compelling case for such grace, I must wonder who could possibly succeed.
 
 
 37
 Therefore I would not simply defer to the Attorney General in this matter. After all, the Attorney General is both the prosecutor and the decision-maker. We are required to review his decisions. I find no reasonable justification for the decision in this case.
 
 
 
 [1]
 Two other circuits have approved this improper reading of the statute. See Ramirez-Ramos v. INS, 814 F.2d 1394, 1396-97 (9th Cir.1987); see also Zardui-Quintana v. Richard, 768 F.2d 1213, 1222-23 (11th Cir.1985) (Vance, J., concurring). With all due respect, I do not find the reasoning of these cases particularly compelling. Neither addresses the need to avoid judicial annulment of statutory language through arbitrary interpretation